UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

VICTOR LOPEZ, INDIVIDUALLY AND ON
BEHALF OF ALL OTHER PERSONS
SIMILARLY SITUATED,

                Plaintiffs,

      v.

HILTON WORLDWIDE INC.

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>ECF CASE</u>

No.: _____

CLASS ACTION COMPLAINT

<u>JURY TRIAL DEMANDED</u>

<u>INTRODUCTION</u>

1.      Plaintiff, VICTOR LOPEZ, on behalf of himself and others similarly situated ("Plaintiff"), asserts the following claims against Defendant, HILTON WORLDWIDE INC. ("Defendant" or "Hilton"), as follows.

2.      Plaintiff is a visually-impaired and legally blind person who requires screen-reading software to read website content using his computer. Plaintiff uses the terms "blind" or "visually-impaired" to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200. Some blind people who meet their definition have limited vision. Others have no vision.

3.      Based on a 2010 U.S. Census Bureau report, approximately 8.1 million people in the United States are visually impaired, including 2.0 million who are blind, and according to the American Foundation for the Blind's 2015 report, approximately 400,000 visually impaired persons live in the State of New York.

4.     Plaintiff asserts claims under the Americans With Disabilities Act ("ADA"), New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") against Defendant.

5.     Because Defendant's website, https://www3.hilton.com/en/index.html(the "Website" or "Defendant's Website")[1], fails to identify and describe accessible features in the hotels and guest rooms offered through its reservations service on its Website in enough detail to reasonably permit individuals with disabilities such as the Plaintiff to assess independently whether a given hotel or guest room meets his or her accessibility needs, it violates the provisions of the ADA including certain regulations promulgated thereunder (28 C.F.R. § 36.302(e)(1)).

6.     Plaintiff seeks a permanent injunction to cause a change in Defendant's corporate policies, practices, and procedures so that Defendant's Website will include information as to accessibility features in their hotels and guest rooms to reasonably permit individuals with disabilities, including Plaintiff, to assess independently whether Defendant's hotels or guest rooms meet his or her accessibility needs so that Defendant's hotels become and remain accessible to blind and visually-impaired consumers. *See, Poschmann v. Coral Reef of Key Biscayne Developers, Inc.,* (U.S.D.C. SDFL, May 23, 2108), WL 3387679, Lexis 87457.

JURISDICTION AND VENUE

7.     The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 12181, as Plaintiff's claims arise under Title III of the ADA, 42 U.S.C. § 12181, *et seq*., and 28 U.S.C. § 1332.

---

[1] Included in the definition of Defendant's website are all of the subsidiary websites for all of Hilton's brands as set forth hereinafter which are all accessed through this website, the "main website". The list of the other websites is set forth in Exhibit "A" annexed hereto.

8.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's New York State Human Rights Law, N.Y. Exec. Law Article 15, ("NYSHRL") and New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*, ("NYCHRL") claims.

9.     Venue is proper in this District under 28 U.S.C. §1391(b)(1) and (2) because Defendant does business by owning, managing and/or operating several hotels in New York, NY in this District and would thereby be considered a resident of this District if it were a separate state and 28 U.S.C. §1391(d) because a substantial part of the events giving rise to this claim occurred in this District due to the Plaintiff attempting to access the Defendant's website from his home in New York, NY.

10.     Defendant is subject to personal jurisdiction in this District. Defendant has been and is committing the acts or omissions alleged herein in the Southern District of New York that caused injury, and violated rights the ADA prescribes to Plaintiff and to other blind and other visually impaired-consumers.  Plaintiff has been denied the full use and enjoyment of the Defendant's facilities, goods, and services of Defendant's physical hotels as a result of Defendant's failure to include information relating to the accessibility features of its facilities and information relating to its accessible guest rooms in enough detail on its reservation system to permit Plaintiff to access whether the facility and/or the guest room meets its individual needs. The lack of information on the Website reservation system has caused a denial of Plaintiff's full and equal access to Defendant's hotels.

11.     The Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

12.     Plaintiff, at all relevant times, is a resident of New York, New York. Plaintiff is a blind, visually-impaired handicapped person and a member of a protected class of individuals under the ADA, under 42 U.S.C. § 12102(1)-(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.*, the NYSHRL and NYCHRL.

13.     Hilton Worldwide Inc., is and was, at all relevant times herein, a Delaware corporation with its principal place of business at 7930 Jones Drive, Suite 1100, McLean, VA[2].

14.     Hilton is one of the largest hospitality companies in the world "with 5,284 properties comprising 856,115 rooms…as of December 31,2017"[3]. Hilton operates under 14 different registered brand names: Waldorf Astoria, Conrad, Canopy, Hilton, Curio, Doubletree, Tapestry Collection, Embassy Suites, Hilton Garden Inn, Hampton, Tru, Homewood Suites, Home 2 Suites, and Hilton Grand Vacations. All of these brands have hotels in the United States and many of them operate in New York City and/or the rest of New York State.

15.     Hilton "manage a global reservation system that communicates reservations to our branded hotels when made by individuals directly, either online, by telephone to our call centers, through devices via our mobile application, or through intermediaries like travel agents, internet travel web sites and other distribution channels." [4]

16.     Hilton has been fully aware of its obligations pursuant to the ADA (as well as state and municipal laws) especially since Hilton was sued by the United States in 2010 for ADA violations.[5] As a result of that action, Hilton entered into a Consent Decree with the U.S. to remedy ADA violations, a copy of which is annexed hereto as Ex."B". Among the findings by

---

[2] Set forth in form 10-K for fiscal year ended Dec. 31, 2018 filed with the U.S. Securities and Exchange Commission, pg. 1.
[3] *Id.* at 3
[4] *Id*. at 21
[5] *U.S. v. Hilton Worldwide, Inc.,* U.S.D.C. DC 10-1924.

the U.S. was that Hilton "failed to provide accurate, reliable information about its accessible sleeping rooms and amenities throughout its reservation system…In sum, the United States states that these failures constitute a pattern or practice of discrimination and unlawful discrimination that raises an issue of general public importance. 42 U.S.C. §12188(b)(1)(B)(i)-(ii)." *Consent Decree* at 1

## NATURE OF ACTION

17.     The Internet has become a significant source of information, a portal, and a tool for conducting business, doing everyday activities such as shopping, learning, banking, researching, choosing hotel accommodations, as well as many other activities for sighted, blind and visually-impaired persons alike.

18.     Blind and visually-impaired people have the ability to access websites using keyboards in conjunction with screen access software that vocalizes the visual information found on a computer screen or displays the content on a refreshable Braille display. Their technology is known as screen-reading software. Screen-reading software is currently the only method a blind or visually-impaired person may independently access the Internet. Unless websites are designed to be read by screen-reading software, blind and visually-impaired persons are unable to fully access websites, and the information, products, and services contained thereon.

19.     Blind and visually-impaired users of Windows operating system-enabled computers and devices have several screen reading software programs available to them. Some of these programs are available for purchase and other programs are available without the user having to purchase the program separately. Job Access With Speech, otherwise known as

"JAWS" is currently the most popular, separately purchased and downloaded screen-reading software program available for a Windows computer.

20.     For screen-reading software to function, the information on a website must be capable of being rendered into text. If the website content is not capable of being rendered into text, the blind or visually-impaired user is unable to access the same content available to sighted users.

21.     The international website standards organization, the World Wide Web Consortium, known throughout the world as W3C, has published version 2.0 of the Web Content Accessibility Guidelines ("WCAG 2.0"). WCAG 2.0 are well-established guidelines for making websites accessible to blind and visually-impaired people. These guidelines are universally followed by most large business entities, most Courts and government agencies to ensure their websites are accessible.  Hilton even states on their website that they are "committed to maintaining compliance with the Level A success criteria of the …WCAG 2.0".

22.     On March 15, 2012, the revised regulations implementing Title III of the ADA took effect, imposing significant new obligations on inns, motels, hotels and other "places of lodging," specifically, 28 C.F.R. § 36.302(e)(i) provides that:

> Reservations made by places of lodging.  A public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in person, or by a third party ---
>
> (i)     Modify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms;
>
> (ii)    Identify and describe accessible features in the hotels and guest rooms offered through its reservations service in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs;

(iii)   Ensure that accessible guest rooms are held for use by individuals with disabilities until all other guest rooms of that type;

(iv)   Reserve, upon request, accessible guest rooms or specific types of guest rooms and ensure that the guest rooms requested are blocked and removed from all reservation systems; and

(v)   Guarantee that the specific accessible guest room or guest rooms reserved through its reservations service is held for the reserving customer, regardless of whether a specific room is held in response to reservations made by others

23.   Hotels are required to identify and describe all accessible features in the hotel and guest rooms; "[t]his requirement is essential to ensure individuals with disabilities receive information they need to benefit from the services offered by the place of lodging." 28 C.F.R. Part 36, Appx. A. Moreover, "a public accommodation's designation of a guest room as 'accessible' does not ensure necessarily that the room complies with all of the 1991 Standards." 28 C.F.R. Part 36, Appx. A. Labeling a guest room as "accessible" or "ADA" is not sufficient. Accordingly, Defendant is required to set forth specific accessible features and not merely recite that a guest room is "accessible" or "ADA compliant" or list accessibility features that may (or may not) be offered within a particular room.

24.   For hotels in buildings constructed after the effective date of 1991, such as many of Defendant's hotels, the regulations provide that it is sufficient to advise that the hotel itself is fully ADA compliant, and for each accessible guest room, to specify the room type, the type of accessible bathing facility in the room, and the communications features in the room. 28 C.F.R. Part 36, Appx. A. For hotels built before the effective date in 1991, there is detailed information relating to the description of individual accessibility features that the hotel is also required to disclose.

25.   In promulgating these new requirements, it is clear that the intention of the Department of Justice is to ensure that individuals with disabilities should be able to reserve

hotel rooms with the same efficiency, immediacy, and convenience as those who do not need accessible guest rooms. 28 C.F.R. Part 36, Appx. A.

STATEMENT OF FACTS

Defendant's Website and Compliance with

Requirement to Describe Accessibility Features

26.     Defendant owns and operates numerous hotels in the City of New York as well as many other hotels in different parts of the State of New York (as well as in the rest of the United States). Many of these locations also offer dining and entertainment options, including on-site restaurants, room service and lobby lounges.

27.     Defendant's Website offers features to the public that should allow all consumers to access the facilities and services that it offers about their hotels. The Website is heavily integrated with their hotels, serving as their gateway.

28.     It is, upon information and belief, Defendant's policy and practice to deny Plaintiff, along with other blind or visually-impaired users, using Defendant's Website access to information through their reservation system relating to the availability of ADA compliant rooms and handicap accessible features of the hotel, and to therefore specifically deny the goods and services that are offered and integrated with Defendant's hotels. Due to Defendant's failure and refusal to add information through their reservation system relating to its accessibility for visually-impaired persons on their Website, Plaintiff and visually-impaired persons have been and are still being denied equal access to Defendant's hotels and the numerous goods, services, and benefits offered to the public at Defendant's hotels.

29.     Plaintiff is a visually-impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software. Plaintiff is, however, a proficient JAWS screen-reader user and uses it to access the Internet. Plaintiff has visited the Defendant's Website on separate occasions using the JAWS screen-reader.

30.     During Plaintiff's visits to the Website, as well as all of the brand websites accessed through the main web site (*see, Ex. A*), the last occurring in February, 2019, Plaintiff was not able to determine from the reservation system on the Website what ADA compliant features, if any, the hotels offer and whether the guest rooms have handicap accessible facilities or communications equipment in the guest rooms suitable to blind or visually-impaired persons. As a result, Plaintiff has been denied full and equal access to the facilities, goods and services offered to the public and made available to the public; and that denied Plaintiff the full enjoyment of the facilities, goods, and services of Defendant's physical locations in New York City and New York State by being unable to learn any information about the accessibility features of the hotels or its guest rooms.

<u>Defendant Must Include Information Relating to ADA Compliant Rooms</u>

<u>and Handicap Accessibility Features Through Its Website Reservation System</u>

31.     Due to the lack of information relating to the accessibility features of Defendant's hotels through the reservation system on the Website, blind and visually-impaired customers such as Plaintiff, who need screen-readers, cannot fully and equally use or enjoy the facilities, goods, and services Defendant offers to the public in their hotels. The access barriers Plaintiff encountered have caused a denial of Plaintiff's full and equal access in the past, and now deter Plaintiff on a regular basis using the services that the hotels offer to the public because of the lack of information on accessibility through the reservation system on the Website. Plaintiff

intends to visit Defendant's hotels or book rooms in Defendant's hotels in the future if the Plaintiff was able to learn about the accessibility of Defendant's hotels and guest rooms for blind and vision-impaired persons through the reservation system on their website and those accessibility features meet the needs of the Plaintiff.

32.     These access barriers on Defendant's Website reservation system have deterred Plaintiff from visiting Defendant's physical locations, and enjoying them equal to sighted individuals because: Plaintiff was unable to find information on the Website reservation system relating to the accessibility of the hotels and guest rooms for blind and visually-impaired people and other important information, preventing Plaintiff from reserving a room at the hotels, staying at the hotel and using the facilities of the hotel including restaurants and attending events.

33.     If the hotels and the Website reservation system were equally accessible to all, Plaintiff could independently navigate the Website and complete a desired transaction as sighted individuals do.

34.     Through visiting the Website, Plaintiff has actual knowledge of the lack of information on accessibility features available on the reservation system on the Website that result in making the services and facilities of the hotel inaccessible and independently unusable by blind and visually-impaired people.

35.     Because simple compliance with the provisions of the ADA relating to providing information about accessibility features of the hotels and the guest rooms on its Website reservation system would provide Plaintiff and other visually-impaired consumers with equal access to the services and facilities at Defendant's hotels, Plaintiff alleges that Defendant has engaged in acts of intentional discrimination, including, but not limited to, the failure to provide information on its Website reservation system sufficient to advise that the hotels are fully ADA

compliant, and for each accessible guest room, to  specify the room type, the type of accessible facility in the room, and the communications features in the room.

36.     Defendant therefore use standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others, as alleged herein.

37.     The ADA expressly contemplates the injunctive relief that Plaintiff seeks in this action. In relevant part, the ADA requires:

> In the case of violations of . . . this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities . . . Where appropriate, injunctive relief shall also include requiring the . . . modification of a policy . . .

> 42 U.S.C. § 12188(a)(2).

38.     Because Defendant's Website reservation system has never included the required information, and because Defendant lacks a corporate policy that is reasonably calculated to cause the Website reservation system to include the required information relating to accessibility, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring Defendant to retain a qualified consultant acceptable to Plaintiff ("Agreed Upon Consultant") to assist Defendant to comply with the  ADA regulations requiring certain accessibility information to be included on  Defendant's Website reservation system. Plaintiff seeks that their permanent injunction requires Defendant to cooperate with the Agreed Upon Consultant to:

a.     Train Defendant's employees and agents who develop the Website for accessibility and compliance to identify and describe accessible features in the hotels and guest rooms on the Website reservation system and a statement that the hotels are fully ADA compliant, and for each accessible guest room, to specify the room type, the type of accessible facility in the room including a detailed description of the features of such facility so that a blind or visually-impaired person can determine if the features meet such person's needs, and the

communications features in the room including a detailed description of the communications features so that a blind or visually-impaired person can independently determine if the features meet such person's needs, including, but not limited to:

1. Whether Defendant's employees and agents such as managers, bellstaff, doormen, concierges, transportation providers, security personnel, front desk and other staff are trained to assist blind and vision-impaired guests with basic needs such as: completing the hotel registration; learning about and completing service requests like laundry, dry cleaning, valet, shipping, room service, etc.; reviewing the hotel bill and charges; counting and identifying currency; using a signature guide or template in conjunction with their credit card; using a passcard-type of key; luggage rooms, business center, gym or health club, lounge facilities, rest rooms; orienting guests to hotel and guest room layouts; location of fire alarms, emergency exits and equipment; heating and air conditioning controls; TV remote controls;  message retrieval system; automated wake-up systems; and safe deposit box.

2. Whether Defendant accepts guide dogs and, if so, if there are any charges associated with the guide dogs, their policies with respect to guide dogs and if there are any rest areas for guide dogs.

3. Whether the hotels provide a braille and/or large print menu for restaurants and/or room service and, in the alternative, if they have trained staff to read the menu to blind or vision-impaired guests.

4. Whether or not emergency exit signs are complaint with ADAAG[6] requirements and emergency evacuation plans and information are provided in braille and large print.

5. Whether or not all accessible signage complies with the requirements of the ADAAG.

---

[6] ADA Accessibility Guidelines promulgated by the United States Access Board

6. Whether or not the stairs, escalators and elevators comply with ADAAG standards, such as braille for floor numbers in the elevator and a verbal annunciator for each floor.

7. Whether or not the hotels have removed or protected protruding objects which protrude more than 4" into walkways and hallways such as drinking fountains, fire extinguishers, and planters and if they provide cane detectible warnings for the underside of stairways.

8. Whether or not the guest rooms contain tactile and large print thermostat controls and talking/large print clocks.

9. Whether or not signage in the hotel can be easily located by blind and vision-impaired persons with 2" minimum height raised letters and braille characters centered at 60" above the finished floor to indicate floor numbers, rest rooms, lobby, vending and ice machines and all other hotel facilities and amenities.

b. Regularly check the accessibility of the Website and its reservation system under the WCAG 2.0 guidelines;

c. Regularly test user accessibility by blind or vision-impaired persons to ensure that Defendant's Website and the reservation system complies under the WCAG 2.0 guidelines; and

d. Regularly check the hotels and the guest rooms to ensure that the accessibility features that they describe on its website reservation system are in fact available and properly maintained.

39. If the ADA-required information is included on the Website reservation system, Plaintiff and similarly situated blind and visually-impaired people could independently determine through use of the Website if Defendant's hotels and guest rooms are ADA compliant and if the

facilities described relating the facilities and communications equipment in guest rooms are acceptable to the Plaintiff and similarly situated blind and visually-impaired people

40.     Although Defendant may currently have centralized policies regarding maintaining and operating its Website and the inclusion of information on the Website, Defendant lacks a plan and policy reasonably calculated to include the ADA-required information on the Website reservation system to make such information fully and equally accessible to, and independently usable by, blind and other visually-impaired consumers.

41.     Defendant has, upon information and belief, invested substantial sums in developing and maintaining the Website and has generated significant revenue from the Website. These amounts are far greater than the associated cost of including the information required under the ADA regulations on the Website reservation system in order to make its facilities and guest rooms equally accessible to visually impaired customers. In 2018, Hilton had revenue of $9,140,000,000.[7]

42.     Without injunctive relief, Plaintiff and other visually-impaired consumers will continue to be unable to independently use the Website reservation system to obtain information relating to ADA accessibility of the hotels and their guest rooms, violating their rights.

<u>CLASS ACTION ALLEGATIONS</u>

43.     Plaintiff, on behalf of himself and all others similarly situated, seeks to certify a nationwide class under Fed. R. Civ. P. 23(a) and 23(b)(2): all legally blind individuals in the United States who have attempted to access Defendant's Website to obtain the ADA-required accessibility information and as a result have been denied access to the equal enjoyment of goods and services offered in Defendant's physical locations, during the relevant statutory period.

---

[7] 10-K *Id.* at 40.

44.     Plaintiff, on behalf of himself and all others similarly situated, seeks to certify a New York State subclass under Fed. R. Civ. P. 23(a) and 23(b)(2): all legally blind individuals in the State of New York who have attempted to access Defendant's Website to obtain the ADA-required information and as a result have been denied access to the equal enjoyment of goods and services offered in Defendant's physical locations, during the relevant statutory period.

45.     Plaintiff, on behalf of himself and all others similarly situated, seeks to certify a New York City subclass under Fed. R. Civ. P. 23(a) and 23(b)(2): all legally blind individuals in the City of New York who have attempted to access Defendant's Website to obtain the ADA-required information and as a result have been denied access to the equal enjoyment of goods and services offered in Defendant's physical locations, during the relevant statutory period.

46.     Common questions of law and fact exist amongst Class, including:

a.     Whether Defendant's Website reservation system contains the information on accessibility required under the ADA regulations;

b.     Whether Defendant's Website is a "place or provider of public accommodation" under the NYSHRL or NYCHRL;

c.     Whether Defendant's Website denies the full and equal enjoyment of its goods, services, facilities, privileges, advantages, or accommodations to people with visual disabilities, violating the ADA; and

d.     Whether Defendant's Website denies the full and equal enjoyment of its goods, services, facilities, privileges, advantages, or accommodations to people with visual disabilities, violating the NYSHRL or NYCHRL.

47.     Plaintiff's claims are typical of the Class. The Class, similarly to the Plaintiff, are severely visually impaired or otherwise blind, and claim that Defendant have violated the ADA,

NYSHRL or NYCHRL by failing to include the ADA-required information on the Website reservation system so individuals with disabilities can independently assess if Defendant's hotels or guest rooms meet the accessibility needs of the Plaintiff and the Class.

48.     Plaintiff will fairly and adequately represent and protect the interests of the Class Members because Plaintiff has retained and is represented by counsel competent and experienced in complex class action litigation, and because Plaintiff has no interests antagonistic to the Class Members. Class certification of the claims is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the Class as a whole.

49.     Alternatively, class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because fact and legal questions common to Class Members predominate over questions affecting only individual Class Members, and because a class action is superior to other available methods for the fair and efficient adjudication of their litigation.

50.     Judicial economy will be served by maintaining their lawsuit as a class action in that it is likely to avoid the burden that would be otherwise placed upon the judicial system by the filing of numerous similar suits by people with visual disabilities throughout the United States.

<u>FIRST CAUSE OF ACTION</u>
VIOLATIONS OF THE ADA, 42 U.S.C. § 12181 *et seq.*

51.     Plaintiff, on behalf of himself and the Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

52.     Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 *et seq.*, provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

53.     Defendant's hotels are places of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7)(A). Defendant's Website is a service, privilege, or advantage of Defendant's hotels. The Website is a service that is integrated with the Defendant's hotels and is a gateway thereto.

54.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

55.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

56.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things:

[A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good,

service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).

57.     The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits the major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A)-(2)(A). Furthermore, Plaintiff has been denied full and equal access to the ADA-required information on the Website reservation system, and, as a result, has not been provided services that are provided to other patrons who are not disabled, and has been provided services that are inferior to the services provided to non-disabled persons. Defendant have failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

58.     Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff, requests relief as set forth below.

SECOND CAUSE OF ACTION
VIOLATIONS OF THE NYSHRL

59.     Plaintiff, on behalf of himself and the New York State Sub-Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

60.     N.Y. Exec. Law § 296(2)(a) provides that it is "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the . . . disability of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

61.     Defendant's physical hotels are located in the State of New York and constitute places of public accommodation within the definition of N.Y. Exec. Law § 292(9). Defendant's

Website is a service, privilege or advantage of Defendant. Defendant's Website is a service that is heavily integrated with these physical locations and is a gateway thereto.

62.     Defendant is subject to New York Human Rights Law because it owns and operates its physical locations and Website. The Defendant is a person within the meaning of N.Y. Exec. Law § 292(1).

63.     Defendant is violating N.Y. Exec. Law § 296(2)(a) in refusing to include the ADA-required information on the Website reservation system, causing the Website and the services integrated with Defendant's physical locations to be completely inaccessible to the blind. This inaccessibility denies blind patrons full and equal access to the facilities, goods and services that Defendant makes available to the non-disabled public.

64.     Under N.Y. Exec. Law § 296(2)(c)(i), unlawful discriminatory practice includes, among other things, "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations being offered or would result in an undue burden."

65.     Under N.Y. Exec. Law § 296(2)(c)(ii), unlawful discriminatory practice also includes, "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden."

66.     Readily available, well-established guidelines exist on the Internet for including the ADA-required information on websites making such websites accessible to the blind and visually impaired. Incorporating the basic components to make the Website reservation system include the ADA-required information would neither fundamentally alter the nature of Defendant's business nor result in an undue burden to Defendant.

67.     Defendant's actions constitute willful intentional discrimination against the class on the basis of a disability in violation of the NYSHRL, N.Y. Exec. Law § 296(2) in that Defendant has:

a.      constructed and maintained a website that does not contain the ADA-required information on its reservation system making their hotels inaccessible to blind class members with knowledge of the discrimination; and/or

b.      failed to take actions to correct the lack of the ADA-required information in the face of substantial harm and discrimination to blind class members.

68.     Defendant has failed to take any prompt and equitable steps to remedy their discriminatory conduct. These violations are ongoing.

69.     Defendant discriminates, and will continue in the future to discriminate against Plaintiff and New York State Sub-Class Members on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of Defendant's Website and their physical locations under § 296(2) *et seq.* and/or its implementing regulations. Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff and the Sub-Class Members will continue to suffer irreparable harm.

70.     Defendant's actions were and are in violation of New York State Human Rights Law and therefore Plaintiff invokes his right to injunctive relief to remedy the discrimination.

71.     Plaintiff is also entitled to compensatory damages, as well as civil penalties and fines under N.Y. Exec. Law § 297(4)(c) *et seq.* for each and every offense.

72.     Plaintiff is also entitled to reasonable attorneys' fees and costs.

73.     Under N.Y. Exec. Law § 297 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

THIRD CAUSE OF ACTION
VIOLATIONS OF THE NYCHRL

74.     Plaintiff, on behalf of himself and the New York City Sub-Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

75.     N.Y.C. Administrative Code § 8-107(4)(a) provides that "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation, because of . . . disability . . . directly or indirectly, to refuse, withhold from or deny to such person, any of the accommodations, advantages, facilities or privileges thereof."

76.     Defendant's hotels are places of public accommodation within the definition of N.Y.C. Admin. Code § 8-102(9), and the Website is a service that is integrated with their establishments.

77.     Defendant is subject to NYCHRL because it owns and operates physical locations in the City of New York and the Website, making the Defendant a person within the meaning of N.Y.C. Admin. Code § 8-102(1).

78.     Defendant is violating N.Y.C. Administrative Code § 8-107(4)(a) in refusing to update the Website and remove access barriers to its hotels by failing to include the ADA-

required information on its reservation system, causing the services integrated with their physical locations to be completely inaccessible to the blind. The inaccessibility denies blind patrons full and equal access to the facilities, goods, and services that Defendant makes available to the non-disabled public.

79.    Defendant is required to "make reasonable accommodation to the needs of persons with disabilities . . . any person prohibited by the provisions of [§ 8-107 *et seq.*] from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

80.    Defendant's actions constitute willful intentional discrimination against the Sub-Class on the basis of a disability in violation of the N.Y.C. Administrative Code § 8-107(4)(a) and § 8-107(15)(a) in that Defendant has:

        a.    constructed and maintained a website that does not contain the ADA-required information on its reservation system making their hotels inaccessible to blind class members with knowledge of the discrimination; and/or

        b.    failed to take actions to correct the lack of the ADA-required information in the face of substantial harm and discrimination to blind class members.

81.    Defendant has failed to take any prompt and equitable steps to remedy their discriminatory conduct. These violations are ongoing.

82.    As such, Defendant discriminates, and will continue in the future to discriminate against Plaintiff and members of the proposed class and subclass on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of the Website and their establishments under § 8-

107(4)(a) and/or its implementing regulations. Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff and members of the class will continue to suffer irreparable harm.

83.     Defendant's actions were and are in violation of the NYCHRL and therefore Plaintiff invokes his right to injunctive relief to remedy the discrimination.

84.     Plaintiff is also entitled to compensatory damages, as well as civil penalties and fines under N.Y.C. Administrative Code § 8-120(8) and § 8-126(a) for each offense as well as punitive damages pursuant to § 8-502.

85.     Plaintiff is also entitled to reasonable attorneys' fees and costs.

86.     Under N.Y.C. Administrative Code § 8-120 and § 8-126 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

FOURTH CAUSE OF ACTION<br/>
DECLARATORY RELIEF

87.     Plaintiff, on behalf of himself and the Class and New York State and City Sub-Classes Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

88.     An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes that Defendant denies, that the Website does not contain the ADA-required information on its reservation system denying blind customers the full and equal access to the goods, services and facilities of the Website and by extension their physical locations, which Defendant owns, operates and controls, fails to comply with applicable laws including, but not limited to, Title III of the Americans with Disabilities Act, 42 U.S.C. §§

12182, *et seq.*, N.Y. Exec. Law § 296, *et seq.*, and N.Y.C. Admin. Code § 8-107, *et seq.* prohibiting discrimination against the blind.

89.     A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests the Court grant the following relief:

a.     A preliminary and permanent injunction to prohibit Defendant from violating the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.,* N.Y. Exec. Law § 296, *et seq.,* N.Y.C. Administrative Code § 8-107, *et seq*., and the laws of New York;

b.     A preliminary and permanent injunction requiring Defendant to take all the steps necessary to make the Website reservation system into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that the Website contains the ADA-required information making their hotels and guest rooms accessible to and usable by blind and vision-impaired individuals;

c.     A declaration that Defendant owns, maintains and/or operates the Website reservation system in a manner that discriminates against the blind and vision-impaired and which fails to provide access for persons with disabilities as required by Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.,* N.Y. Exec. Law § 296, *et seq*., N.Y.C. Administrative Code § 8-107, *et seq*., and the laws of New York

d.     An order certifying the Class and Sub-Classes under Fed. R. Civ. P. 23(a) & (b)(2) and/or (b)(3), appointing Plaintiff as Class Representative, and his attorneys as Class Counsel;

     e.     Compensatory damages in an amount to be determined by proof, including all applicable statutory and punitive damages and fines, to Plaintiff and the proposed class and subclasses;

     f.     Pre- and post-judgment interest;

     g.     An award of costs and expenses of the action together with reasonable attorneys' and expert fees; and

     h.     Such other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact the Complaint raises.

Dated: New York, New York
    March  , 2019

GOTTLIEB & ASSOCIATES
<u>s/Jeffrey M. Gottlieb</u>

Jeffrey M. Gottlieb (JG-7905)
Dana L. Gottlieb (DG-6151)
GOTTLIEB & ASSOCIATES
150 East 18th Street, Suite PHR
New York, New York 10003
Tel: 212.228.9795
Fax: 212.982.6284
nyjg@aol.com

-25-

# Exhibit A

Hilton- https://www3.hilton.com/en/index.html

a. Waldorf Astoria- https://waldorfastoria3.hilton.com/en/index.html
b. The Conrad (Conrad Hotels)- https://www.conradnewyork.com
c. The London NYC (Conrad Hotels)- https://www.thelondonnyc.com/
d. The Martinique- http://www.themartinique.com/
e. Doubletree- https://doubletree3.hilton.com/en/index.html
f. Distrikt Hotel- https://www.distrikthoteltimessquare.com/
g. The Bernic Hotel- https://www.thebernichotel.com/
h. Embassy Suites- https://embassysuites3.hilton.com/en/index.html
i. Hilton Garden Inn- https://hiltongardeninn3.hilton.com/
j. Hampton- https://hamptoninn3.hilton.com/en/index.html
k. Homewood Suites-
https://homewoodsuites3.hilton.com/en/index.html
l. Home2- https://home2suites3.hilton.com/en/index.html
m. Hilton Grand Vacations - https://www.hiltongrandvacations.com/
n. The Renwick- https://curiocollection3.hilton.com/en/hotels/new-
york/the-renwick-hotel-new-york-city-curio-collection-by-hilton-
NYCRWQQ/index.html

# Exhibit B

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | Civil Action No. 10 1924 |
| | ) | |
| Plaintiff, | ) | Judge Roberts |
| | ) | |
| v. | ) | |
| | ) | |
| HILTON WORLDWIDE INC., | ) | |
| | ) | |
| Defendant. | ) | |

### CONSENT DECREE

The United States files this action to enforce provisions of the Americans with Disabilities Act ("ADA") against Defendant, Hilton Worldwide, Inc. ("HWI"). The United States alleges that HWI, which either owns, manages, or has entered into and maintains franchise license agreements with the hotel owners or the agents of the hotel owners of each facility in the HWI system, operating under various trade and service names and marks, failed to design and construct its facilities built after January 26, 1993 in compliance with the ADA, and fails to provide individuals with disabilities the same opportunity to reserve accessible guestrooms using its on-line and telephonic reservations systems that is available for reserving other Hilton hotel rooms. The United States alleges that HWI's actions constitute a pattern or practice of violating Title III of the ADA. HWI denies all of the United States' allegations. The United States and HWI agree that it is in the Parties' best interests, and the United States believes it is in the public interest, to fully and finally resolve this matter on mutually agreeable terms without resort to protracted litigation. The United States and HWI hereby agree and stipulate to the Court's entry of this Consent Order and Final Judgment resolving the United States' complaint against HWI.

NOW IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

## JURISDICTION AND VENUE

The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§1331 and 1345, and 42 U.S.C. §12188(b). Venue is appropriate in this District pursuant to 28 U.S.C. §1391.

## BACKGROUND

1. The United States states that HWI is a "public accommodation" within the meaning of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181(7)(A), and 28 C.F.R. §36.104. The United States states that HWI operates a system of more than 2,800 hotels throughout the United States under various trade and service names and marks including, *inter alia*, Hilton, Conrad Hotels & Resorts, Doubletree, Embassy Suites Hotels, Hampton Inn, Hampton Inn & Suites, Hilton Garden Inn, Hilton Grand Vacations, Homewood Suites by Hilton, the Waldorf Astoria, the Waldorf Astoria Collection, and Home2 Suites by Hilton. Hotels are places of public accommodation within the meaning of 42 U.S.C. § 12181(7)(A), defined as, "an inn, hotel, motel, or other place of lodging." The United States states that HWI either owns or has entered into and maintains franchise license agreements with the hotel owners or the agents of the hotel owners of each facility that participates in the HWI franchise system.

2. The United States states that it has completed surveys of thirteen hotels over a period of three months among four HWI Brands: Hilton, Hilton Garden Inn, Hampton Inn and Homewood Suites.

3. The United States states that it has examined the HWI reservations website to determine whether an individual with a disability can reserve an accessible room using the internet reservations system.

4. The United States states that its investigation found, *inter alia*, that HWI failed to design and construct these hotels in compliance with the ADA, failed to provide accurate, reliable information about its accessible sleeping rooms and amenities throughout its reservations system, failed to disperse accessible rooms among the various classes of sleeping rooms accommodations, failed to provide the required number of accessible sleeping rooms and roll-in showers, failed to properly equip accessible rooms for individuals who are deaf or hard of hearing, failed to provide accessible signage, and failed to comply with the ADA Standards for Accessible Design, 28 C.F.R. Part 36, App. A for protruding objects. In sum, the United States states that these failures constitute a pattern or practice of discrimination

and unlawful discrimination that raises an issue of general public importance. 42 U.S.C. § 12188(b)(1)(B)(i)-(ii).

5. The United States states that HWI's failure to design and construct the thirteen hotels that it investigated and other Brand Hotels (as defined in Paragraph 13) to be readily accessible to and usable by individuals with disabilities violates Section 303(a)(1) of the ADA, 42 U.S.C. §12183(a)(1), and constitutes a pattern or practice of discrimination within the meaning of 42 U.S.C. § 12188(b)(1)(B)(ii) and 28 C.F.R. § 36.503(a).

6. The United States states that HWI's failure to design and construct the thirteen hotels that it investigated and other Brand Hotels to be readily accessible to and usable by individuals with disabilities also constitutes unlawful discrimination that raises an issue of general public importance within the meaning of 42 U.S.C. §12188(b)(1)(B)(ii) and 28 C.F.R. §36.503(b).

7. The United States states that HWI owns and operates its own central reservations system, both web-based and telephonic, through Hilton Reservations Worldwide, L.L.C. (d/b/a Hilton Reservations & Customer Care), which is a wholly-owned subsidiary of HWI located in Carrolton, Texas. The Hilton Franchise Disclosure Document dated April 27, 2009, requires franchisees to participate in the central reservations system, and to give first priority to confirmed reservations made through the system. Individuals can reserve guest rooms at any Brand Hotel -- corporate-owned or owned through a corporate joint venture, managed, or franchised -- through their system.

8. The United States states that individuals with disabilities are unable to reserve accessible sleeping accommodations through the Hilton Reservations & Customer Care system, in violation of the requirements of section 302(a)(1) of the Act, 42 U.S.C. § 12182(a)(1) including, but not limited to, the items set forth below:

(a) individuals with disabilities are unable to reserve, on-line, accessible sleeping accommodations with either a tub or a roll-in shower;

(b) individuals who are deaf or hard of hearing are unable to reserve, on-line, a guest room fitted with visual alarms;

(c) the on-line reservations system does not accurately reflect the inventory of accessible types of rooms and amenities available at each property, i.e., two bedded rooms, one bedded rooms, suites, or adjoining rooms;

(d) the telephone reservations system does not accurately reflect the inventory of accessible types of rooms and amenities available at each property, i.e., two bedded rooms, one bedded rooms, suites, or adjoining rooms; and

(e) individuals with disabilities who have made reservations for accessible sleeping accommodations, on-line or by telephone, upon arrival, are not provided with the accessible sleeping accommodations they reserved.

9. The United States states that by its substantial involvement in the design and construction of HWI-owned, HWI-managed, and HWI-franchised hotels, HWI fails to provide hotels that are readily accessible to or usable by individuals with disabilities, as required by section 303(a)(1) of the Act, 42 U.S.C. § 12183(a)(1). The United States states that HWI fails in numerous respects to comply with the Department of Justice's regulation implementing Title III of the ADA, 28 C.F.R. Part 36, including the ADA Standards. *See* 28 C.F.R. §§36.401, 36.406.

10. The United States states that HWI discriminates against individuals with disabilities on the basis of disability in the full and equal enjoyment of its goods, services, facilities, privileges, advantages, and accommodations, in violation of Title III of the ADA, 42 U.S.C. § 12182, and its implementing regulation, 28 C.F.R. Part 36.

11. The United States states that in addition to constituting a pattern or practice of discrimination, the failures of HWI to make reasonable modifications to its policies, practices and procedures for individuals with disabilities constitute unlawful discrimination that raises an issue of general public importance within the meaning of 42 U.S.C. §12188(b)(1)(B)(ii) and 28 C.F.R. § 36.503(b).

12. HWI denies each and every statement contained in Paragraphs 1-11 above. HWI states that it owns a limited number of hotels outright, has an ownership interest in a limited number of additional hotels, manages some hotels pursuant to management agreements with hotel owners, and maintains franchise license agreements with the owners of most of the Brand Hotels. HWI denies that it has violated the ADA, or that it is in any way responsible for any purported non-compliance with the ADA in connection with hotels that it does not own or manage. HWI states that it neither owns nor operates, within the meaning of Title III of the ADA, 42 U.S.C. § 12182(a), the vast majority of Brand Hotels. HWI specifically denies that it operates, within the meaning of Title III of the ADA, 42 U.S.C. § 12182(a), any Franchised Hotels (as defined in Paragraph 13 below) for purposes of liability under 42 U.S.C. § 12182. HWI further states that its Reservations System (as defined in Paragraph 13 below) provides individuals with disabilities with ample opportunity to identify and reserve accessible rooms that are available at hotels within

the Reservations System. HWI further denies that it failed to design and construct its hotels in accordance with the requirements of Title III of the ADA.

## **INJUNCTIVE RELIEF**

13. <u>DEFINITIONS</u>.

The Parties agree and stipulate that the following terms shall be defined for purposes of this Consent Decree:

13.1 "ADA" shall mean and refer to the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. in effect as of the Effective Date.

13.2 "ADA Standards" shall mean and refer to the Standards for Accessible Design as set forth at 28 C.F.R. pt. 36, Appendix A, published in 28 C.F.R. Part 36 (July 1, 2004).

13.3 "Alteration" solely for purposes of this Consent Decree, shall mean and refer to an alteration to an accessible guest room or guest room toilet room that (1) increases or decreases the number of accessible guest rooms as a result of construction; (2) increases or decreases the size of the guest room and/or guest room toilet room as a result of construction; or (3) changes the size or configuration of the guest room toilet room tub or shower (excluding replacing faucet/tub handles).

13.4 "Brand" means a trademark owned or controlled by HWI used to identify a chain of hotels in the United States operating under a common set of operating, design and construction standards.

13.5 "Brand Hotel" means a hotel in the United States operating under any of the Brands, including Franchised Hotels.

13.6 "Brand Standards" means the standards for each Brand contained in the integrated Brand Standards Manual for that Brand posted on HWI's intranet, together with supplemental documents, guidelines and manuals of HWI referenced in the Brand Standards Manuals, which are usually updated on an annual basis.

13.7 "Consent Decree Date" is the date on which the Court enters this Consent Decree.

13.8 "Effective Date" is the one hundred and twentieth day after the Consent Decree Date.

13.9 "Franchised Hotel" means a hotel in the United States that (1) operates under one of the Brands pursuant to a franchise license agreement with HWI (or a subsidiary of HWI); (2) is not an Owned Hotel; and (3) is not a Managed Hotel.

13.10 "Joint Venture Hotel" means a hotel in the United States in which HWI (or one of its subsidiaries) has less than a 100% ownership interest but more than a 50% ownership interest.

13.11 "Managed Hotel" means a hotel in the United States that is operated by HWI (or one of its subsidiaries) pursuant to a management agreement with the third party owner of the real estate and improvements (including joint ventures in which HWI or an affiliate may hold a 50% or less ownership interest together with third parties), even if the third party owner also has a franchise agreement with HWI (or one of its subsidiaries).

13.12 "Owned Hotel" means a hotel in the United States in which HWI (or one of its subsidiaries) has a 100% fee or leasehold interest in the real estate and improvements.

13.13 "Permitted Transfer" means one of the following:

(1) Intra-Family Transfers: A transfer of interest in a Brand Hotel to or for the benefit of an immediate family member;

(2) Transfers Upon Death: A transfer of interest in a Brand Hotel held by a natural person upon that person's death in accordance with the will or laws of intestacy;

(3) Transfers of Privately Held Equity Interests: A transfer of interest in a Brand Hotel in which, after conveyance of the interest, a 25% or more cumulative interest in the Brand Hotel will have changed hands, so long as such

event does not result in a change of control of the franchise.

(4) Affiliate Transfers: A transfer of interest that does not result in a change in control of the hotel;

(5) Bricks and Mortar Transfers: A transfer of interest in the Brand Hotel in which, after completion of the transaction, the pre-transfer hotel owner retains management control of hotel operations.

13.14 "Post-1993 Franchised Hotel" means a Franchised Hotel constructed for first occupancy after January 26, 1993.

13.15 "Post-1993 Joint Venture Hotel" means a Joint Venture Hotel constructed for first occupancy after January 26, 1993.

13.16 "Post-1993 Managed Hotel" means a Managed Hotel constructed for first occupancy after January 26, 1993.

13.17 "Post-1993 Owned Hotel" means an Owned Hotel constructed for first occupancy after January 26, 1993.

13.18 "Quality Assurance Inspections" means the periodic inspections by HWI's Quality Assurance Department of each hotel in the system according to standard schedules applied across the system (e.g., annually for most hotels; semi-annually in some instances depending upon previously-identified standards issues) utilizing each Brand's quality assurance checklists to verify appearance of items that can be checked in an average half-day review with a visible, non-intrusive inspection.

13.19 "Reservations System" means a proprietary telephonic and internet-based system maintained by HWI or its subsidiaries capable of taking reservations for Brand Hotels from customers located in the United States and its territories and possessions.

14. NONDISCRIMINATION. For the term of this Consent Decree, HWI, by and through its officials and employees, shall not engage in any practice that discriminates against any individual on the basis of disability in violation of Title III of the ADA in the provision of lodging and related services, including in the new

construction or alteration of an Owned Hotel, Managed Hotel, or Joint Venture Hotel. HWI shall include in all franchise agreements entered into after the Effective Date, including renewals of existing agreements, a statement that franchisees shall comply with Title III of the ADA.

15. For the term of this Consent Decree, the following provisions shall apply to all Post-1993 Owned Hotels and Post-1993 Joint Venture Hotels:

(a) No later than twelve (12) months after the Consent Decree Date, HWI shall conduct surveys of the areas of the hotels open to the public (including all accessible rooms) to assess their compliance with the ADA Standards using an ADA inspector who is approved by the United States. The ADA inspector shall be required to document the results of the surveys in writing and with photographs and shall create a report (the "HWI Hotels Survey Report"). The HWI Hotels Survey Report shall be considered to be commercial information that is privileged and confidential. HWI shall ensure that all Post-1993 Owned Hotels and Post-1993 Joint Venture Hotels comply with the ADA Standards no later than four years after the Consent Decree Date by bringing at least two Post-1993 Owned Hotels or Post-1993 Joint Venture Hotels into compliance with the ADA Standards annually beginning no later than two years after the Consent Decree Date.

(b) In determining whether any Post-1993 Owned Hotel and Post-1993 Joint Venture Hotel has complied with the ADA Standards, the Parties agree that each Post-1993 Owned Hotel and each Post-1993 Joint Venture Hotel meets its obligations under ADA Standards § 9.1.4 to disperse accessible units among the various classes of sleeping accommodations if the inventory of accessible rooms required under ADA Standards § 9.1.2 ( i.e., rooms with features for individuals with mobility disabilities and hearing impairments) includes at least one suite (if the hotel has more than one suite), one room with one bed, one room with two beds, and one room with a premium view (if the hotel offers more than one room with a premium view at a higher cost), one room on the executive level (if the hotel has an executive level), and one smoking room (if the hotel offers smoking rooms). At hotels where there are two or more premium views offered, the hotel shall not be required to provide an accessible room in a particular view category if fewer than 5% of the rooms at the hotel fall within that particular view category; however, at least one accessible premium view room must be provided in the hotel. For all Owned Hotels and Joint Venture Hotels under construction as of the Consent Decree Date where architectural plan changes affecting the size or layout of guest rooms or guest room bathrooms are made and construction pursuant to those plans has not been completed, and all Owned Hotels and Joint Venture Hotels where construction begins after the Consent Decree Date, the premium view accessible room shall be in the premium

view category with the most rooms. Nothing in this subparagraph requires a hotel to have more accessible guest rooms than are required under ADA Standards § 9.1.2.

(c) HWI agrees that it shall voluntarily submit to the United States within 120 days of each survey the HWI Hotels Survey Report, including photographs, and a list of the remediation items (if any remediation is required) that are required to bring the Post-1993 Owned Hotel or the Post-1993 Joint Venture Hotel into compliance with the ADA Standards. The United States shall respond in writing to HWI's proposed remediation within 60 days for each Post-1993 Owned Hotel and Post-1993 Joint Venture Hotel. The Parties shall meet or otherwise confer to resolve any disputes within 60 days after HWI's receipt of the United States' response. Any unresolved disputes under this section may be submitted by either Party to the Court within 30 days after the dispute resolution period ends.

(d) Within the timeframe set forth in subparagraph 15(a), HWI shall ensure that each Post-1993 Owned Hotel and Post-1993 Joint Venture Hotel has the required number of accessible rooms with roll-in showers as set forth in ADA Standards §9.1.2, and that each roll-in shower complies with ADA Standards § 4.21 and Figure 57(a) or (b). HWI shall ensure that each Post-1993 Owned Hotel and Post-1993 Joint Venture Hotel has one removable tub seat for each and every accessible tub room in the hotel that does not already have a built-in seat as shown in ADA Standards Figures 33(b) and 34(b), that complies with ADA Standards §§4.20.3, 9.2.2(6)(e).

(e) Within the timeframe set forth in subparagraph 15(a), HWI shall ensure that each Post-1993 Owned Hotel and Post-1993 Joint Venture Hotel has the required number of rooms for guests with hearing impairments, as set forth in ADA Standards §§ 9.1.2 and 9.1.3, that comply with ADA Standards § 9.3. Compliance with ADA Standards § 9.3 may be achieved by providing either (1) visual alarms connected to the building emergency alarm system, and visual notification devices for incoming telephone calls and door knock or bell, or (2) in the case of Post-1993 Owned Hotels and Post-1993 Joint Venture Hotels in operation as of the Consent Decree Date, portable visual notification devices for the alarm, incoming telephone calls, and door knock or bell. If HWI uses portable devices to meet these requirements, it shall have at the property the quantity of portable devices equal to the required number of rooms for guests with hearing impairments in ADA Standards §§ 9.1.2 and 9.1.3. Each Post-1993 Owned Hotel and Post-1993 Joint Venture Hotel shall also comply with all other requirements of ADA Standards § 9.3.1 ( i.e., permanently installed telephones that have volume control and an accessible electrical outlet within 4 ft. of a telephone connection).

HWI shall ensure that each Post-1993 Owned Hotel and Post-1993 Joint Venture Hotel constructed for first occupancy after the Consent Decree Date has the required number of rooms, as set forth in ADA Standards §§ 9.1.2 and 9.1.3, that have visual alarms connected to the building emergency alarm system, and visual notification devices for incoming telephone calls and door knock or bell.

(f) If, after January 26, 1993, HWI constructed an addition (as defined in ADA Standards § 3.4) to an Owned Hotel or Joint Venture Hotel that was originally constructed for first occupancy prior to January 26, 1993, only the addition and the path of travel from the pre-January 26, 1993 portion of the Owned Hotel or Joint Venture Hotel to the addition shall be covered by this Paragraph 15.

16. (a) After the Effective Date and continuing during the term of this Consent Decree ( i.e. the four years after the Effective Date), when

(1) entering into a new franchise or management agreement to convert an existing hotel constructed for first occupancy after January 26, 1993 to a Post-1993 Franchised Hotel or Post-1993 Managed Hotel; (2) renewing or extending for more than six (6) months an existing franchise or management agreement (other than unilateral renewals or extensions by the other party to the agreement) for a Post-1993 Franchised Hotel or Post-1993 Managed Hotel; or (3)consenting to a change of ownership at a Post-1993 Franchised Hotel or Post-1993 Managed Hotel: HWI will require the hotel owner to conduct a survey, using a survey instrument provided by the United States (the "Survey Instrument"), to determine whether

(i) The hotel has the required number of accessible rooms for guests with mobility disabilities required by ADA Standards § 9.1.2, the required number of accessible rooms with roll-in showers as set forth in ADA Standards § 9.1.2, and that each roll-in shower complies with ADA Standards § 4.21 and Figures 57(a) or (b).

(ii) The hotel's inventory of accessible rooms required under ADA Standards § 9.1.2 ( i.e., rooms with features for individuals with mobility disabilities and hearing impairments) complies with ADA Standards § 9.1.4 requirement to disperse accessible units among the various classes of sleeping accommodations. The hotel complies with this requirement if it includes at least one suite (if the hotel has more than one suite), one room with one bed, one room with two beds, and one room with a premium view (if the hotel offers more than one room with a premium view at a higher cost), one room on the executive level (if the hotel has an executive level), and one smoking room (if the hotel offers smoking rooms). At

hotels where there are two or more premium views offered, the hotel shall not be required to provide an accessible room in a particular view category if fewer than 5% of the rooms at the hotel fall within that particular view category; however, at least one accessible premium view room must be provided in the hotel. Nothing in this subparagraph requires a hotel to have more accessible guest rooms than are required under ADA Standards § 9.1.2.

(iii) The hotel has the required number of rooms for guests with hearing impairments, as set forth in ADA Standards §§ 9.1.2 and 9.1.3, that comply with ADA Standards § 9.3. Compliance with ADA Standards § 9.3 may be achieved by either providing (1) visual alarms that are connected to the building emergency alarm system, and visual notification devices for incoming telephone calls and door knock or bell, or (2) portable visual notification devices for the alarm, incoming telephone calls, and door knock or bell. If the hotel uses portable devices to meet these requirements, it shall have at the property a sufficient number of portable devices to ensure that it can fully equip the number of rooms for guests with hearing impairments required by ADA Standards §§ 9.1.2 and 9.1.3 ( i.e., permanently installed telephones that have volume control and an accessible electrical outlet within 4 ft. of a telephone connection).

(iv) Post-1993 Managed Hotels and Post-1993 Franchised Hotels constructed for first occupancy after the Consent Decree Date have the required number of rooms, as set forth in ADA Standards §§ 9.1.2 and 9.1.3, that provide visual alarms that are connected to the building emergency alarm system, and visual notification devices for incoming telephone calls, and door knock or bell and comply with all other requirements of ADA Standards § 9.3.1 (i.e., permanently installed telephones shall have volume control and an accessible electrical outlet within 4 ft. of a telephone connection).

(v) The accessible rooms for individuals with mobility disabilities have the maneuvering clearances for beds specified in ADA Standards §9.2.2(1), to and within the bathroom (ADA Standards § 9.2.2(6)), thermostat and other controls (ADA Standards § 9.2.2(5)), and desks (ADA Standards §§9(1), 4.32), that are required under the ADA Standards.

(vi) The accessible rooms for individuals with mobility disabilities have accessible bathrooms that comply with ADA Standards § 4.23.

(vii) Any non-valet parking facilities owned or operated by the hotel have the number of accessible car and van-accessible parking spaces required by the ADA Standards and comply with the accessibility requirements of the ADA Standards. For parking facilities owned and operated by third parties, HWI will require the hotel owner to send a letter to the owner or operator of that hotel's parking facilities requesting the owner/operator confirm that the hotel's parking facilities provide accessible parking as set forth in ADA Standards §§4.1.2(5), 4.6.2-4.6.5.

(b) The United States will provide HWI with the Survey Instrument referenced in subparagraph 16(a) within 15 days of the Consent Decree Date. HWI will have the right to review and approve the Survey Instrument within 15 days of receipt. After the Parties reach agreement on the Survey Instrument, HWI will work with an ADA Consultant mutually agreeable to the Parties (the "ADA Consultant") to create a training video to educate hotel owners on how to complete the Survey Instrument (the "Survey Video"). The United States will provide its approval or disapproval of ADA Consultant(s) proposed by HWI within 7 days of HWI submitting the name and resume of such consultant(s). HWI will submit the script for the Survey Video to the United States for its review and approval no later than 30 days after the date on which the Parties reach agreement on the Survey Instrument. The United States will approve the Survey Video script within 15 days of its receipt. The Survey Video shall be produced and available for use no later than 30 days after the United States approves the Survey Video script. If the Parties are unable to agree on any of the items set forth in this subparagraph 16(b), then the dispute resolution mechanism of Paragraph 35 will be followed.

(c) When one of the events in the first sentence of Paragraph 16(a) occurs between the Effective Date and four years after the Effective Date, HWI will require the hotel owner to complete the Survey Instrument and to document conditions with photographs where indicated by the Survey Instrument within thirty (30) days of receiving a notice from HWI of a need for a survey (the "Survey Notice"). HWI will not be required to send Survey Notices to any hotel owners until the Survey Instrument and Survey Video have been created and approved. HWI will send a copy of the Survey Notice to the ADA Consultant at the same time that it is sent to the hotel owner. The hotel owner shall be required to send, within 90 days of receiving the Survey Notice, copies of the completed and signed Survey Instrument and photographs to the ADA Consultant, who shall review it for completeness. At the

same time, the hotel owner shall be required to send to the ADA Consultant the information required in subparagraph 16(f) below. A hotel owner may apply to the ADA Consultant for a thirty (30) day extension of time to submit the Survey Instrument and photographs for good cause. The ADA Consultant may grant only one extension. The ADA Consultant shall document all requests for extensions and whether they were granted or denied. If a hotel owner fails to timely submit to the ADA Consultant the documents set forth in this subparagraph 16(c), the ADA Consultant shall notify the hotel owner within ten (10) days so that the hotel owner can take corrective action within twenty (20) days from the date of the notice. The ADA Consultant will provide HWI with a copy of the notice at the same time as it is sent to the hotel owner. If, at the expiration of twenty (20) days, the ADA Consultant determines that the hotel owner has not submitted the documents required under this subparagraph 16(c), the ADA Consultant shall notify the hotel owner and the Parties to this Consent Decree in writing and shall provide supporting documentation to the Parties if either of them requests it.

(d) Any Post-1993 Franchised Hotel or Post-1993 Managed Hotel may opt to submit to the process set forth in this Paragraph 16 without regard to the occurrence of any event described in subparagraphs 16(a)(1)-(3). If any event described in subparagraphs 16(a)(1)-(3) later takes place with respect to such a hotel, it will not be required to go through the process set forth in this Paragraph 16 again.

(e) If any Post-1993 Franchised Hotel or Post-1993 Managed Hotel experiences one or more of the events set forth in subparagraphs 16(a)(1)-(3) after having received a Survey Notice and has either completed or is undergoing the process set forth in this Paragraph 16, that hotel shall not have to go through the process set forth in this Paragraph 16 again.

(f) At the same time that it submits its survey to the ADA Consultant, each hotel owner shall be required to either (i) certify that its hotel complies with all of the conditions set forth in subparagraph 16(a) above; or (ii) submit a plan to the ADA Consultant detailing how it will meet the conditions set forth in subparagraph 16(a) above and setting forth the dates by which the conditions will be achieved. The plan must specify that the conditions set forth in subparagraphs 16(a)(iii)-(vii) above will be achieved within five years from the date of the event triggering the survey requirement set forth in subparagraph 16(a) above. The plan must specify that the conditions set forth in subparagraphs 16(a)(i) & (ii) above will be achieved within seven years from the date of the event triggering the survey requirement set forth in subparagraph 16(a).

(g) Beginning after the Effective Date, the ADA Consultant shall, on a random basis, and with a minimum of two (2) weeks' notice to the hotel owner,

annually perform independent on-site inspections of ten (10) percent of the hotels submitting surveys in that year to verify that the surveys were properly conducted. If the ADA Consultant determines that the survey at an inspected hotel was not properly conducted, (s)he shall inform the hotel owner within sixty (60) days. The hotel owner shall have forty-five (45) days to submit a revised survey and plan or certification to the ADA Consultant. The on-site inspections conducted by the ADA Consultant will include at least one hotel in each Brand, and they must be dispersed geographically across the United States.

(h) Upon completion of all of the items on its plan, each hotel owner shall be required to submit to the ADA Consultant documentary and photographic evidence that it has complied with the plan. The ADA Consultant shall, with a minimum of two (2) weeks' notice to the hotel owner, annually perform independent on-site inspections of ten (10) percent of the hotels that have reported in that year that their plan items have been completed to verify that the plans have been implemented at an inspected hotel. The on-site inspections conducted by the ADA Consultant will include at least one hotel in each Brand and they must be dispersed geographically across the United States. If the ADA Consultant determines that plans have not been properly or correctly implemented, (s)he shall notify the hotel owner within sixty (60) days so that the hotel owner can take corrective action within ninety (90) days from the date of the notice. The ADA Consultant will provide HWI with a copy of the notice at the same time as it is sent to the hotel owner. If, at the expiration of ninety (90) days, the ADA Consultant determines that the hotel owner has not taken corrective action to meet its plan, the ADA Consultant shall notify the hotel owner and the Parties to this Consent Decree in writing and shall provide supporting documentation to the Parties if either of them requests it.

(i) On each anniversary of the Effective Date, the ADA Consultant shall also file a report with the Court and the Parties summarizing the hotel owners' compliance efforts, but not identifying any hotel by name or other specific identifying characteristics. The report shall state the number of hotels by Brand (i) that submitted requests for extensions (and their disposition), surveys, plans, and certifications, (ii) whose surveys were verified by an inspection by the ADA Consultant, (iii) that were inspected by the ADA Consultant to verify plan completion, (iv) that submitted surveys that were not properly executed; (v) that failed to submit surveys in a timely manner; and (vi) that failed to timely implement a plan described in subparagraph 16(f) .

(j) The ADA Consultant shall continue to perform the inspections and monitoring described in subparagraphs 16(g) and (h) (to the extent surveys are submitted or plans completed later than four years after the Effective Date) and make annual reports to the Court and the parties as set forth in subparagraph 16(i) until the

expiration of eleven (11) years after the Effective Date.Notwithstanding any other provision of this Consent Decree, the Court shall retain jurisdiction solely to enforce this Paragraph 16 during this period.

(k) Permitted Transfers, as defined in Paragraph 13.13, for which HWI does not currently require execution of a new form of franchise agreement, are not considered events for which HWI is consenting to a change in ownership for purposes of this Consent Decree.

17. Guest rooms that are individually-owned and not substantially controlled by the entity that owns, leases, or operates the overall facility and whose interior physical features are controlled by the individual owners (condominium guest rooms) shall not be counted in determining compliance with the items in Paragraph 16(a)(i)-(vi), nor shall they be required to be surveyed for purposes of this Consent Decree. The terms of Paragraph 25(e) regarding telephonic and on-line reservations shall not apply to guest rooms that are individually owned and not substantially controlled by the entity that owns, leases, or operates the overall facility and whose interior physical features are controlled by the individual owners.

18. Upon the Effective Date and continuing for the term of this Consent Decree, the following provisions shall apply to Franchised Hotels, Managed Hotels, and Joint Venture Hotels where construction begins on or after the Effective Date ("Newly Constructed Hotels"):

(a) Hotel owners seeking to construct a Newly Constructed Hotel must, prior to the start of construction, submit to the HWI ADA Compliance Officer (designated pursuant to Paragraph 27) a certification from an architect that includes the following representations:

(i) The architect has professional experience applying the requirements of the ADA and the ADA Standards.

(ii) (S)he has reviewed the plans (including architectural interior design plans if they are available prior to construction).

(iii) The plans comply with the ADA Standards.

(iv) (S)he has specifically determined that the plans provide:

(A) accessible car and van-accessible parking spaces required by the ADA Standards if parking facilities are to be provided;

(B) the number of accessible rooms for guests with mobility disabilities (including the number of accessible rooms with roll-in showers) and guests who are deaf or hard of hearing required under ADA Standards § 9.1;

(C) an inventory of accessible rooms required under ADA Standards § 9.1.2 ( i.e., rooms with features for individuals with mobility disabilities and hearing impairments) that includes at least one suite (if the hotel has more than one suite), one room with one bed, one room with two beds, and one room with a premium view (if the hotel offers more than one room with a premium view at a higher cost), one room on the executive level (if the hotel has an executive level), and one smoking room (if the hotel offers smoking rooms). At hotels where there are two or more premium views offered, the hotel shall not be required to provide an accessible room in a particular view category if fewer than 5% of the rooms at the hotel fall within that particular view category. For hotels that offer more than one category of premium view rooms, the premium view accessible room shall be in the premium view category with the most rooms. Nothing in this subparagraph requires a hotel to have more accessible guest rooms than are required under ADA Standards §9.1.2.

(D) the required number of accessible rooms for individuals who are deaf or hard of hearing as set forth in ADA Standards §§ 9.1.2 and 9.1.3, that comply with ADA Standards § 9.3. Compliance with ADA Standards § 9.3 will be achieved by providing visual alarms connected to the building emergency alarm system, and visual notification devices for incoming telephone calls and door knock or bell, and complying with all other requirements of ADA Standards § 9.3.1 ( i.e., permanently installed telephones that have volume control and an accessible electrical outlet within 4 ft. of a telephone connection).

(E) the required number of accessible rooms for individuals with mobility disabilities that comply with the ADA Standards for maneuvering clearances between and around the beds (ADA Standards §9.2.2(1)), to and within the bathroom (ADA Standards § 9.2.2(6)), thermostat and

controls (ADA Standards § 9.2.2(5)), and desks (ADA Standards §§ 9(1), 4.32), and accessible rooms for individuals with mobility disabilities with accessible bathrooms that comply with ADA Standards § 4.23.

(b) Before any Newly Constructed Hotel is open to the public after the Effective Date, HWI will require the hotel owner to provide a certification from an architect that includes the following representations:

(i) The architect has professional experience applying the requirements of the ADA and the ADA Standards.

(ii) (S)he has inspected all areas of the hotel that are open to the public (including accessible guest rooms), and they comply with the ADA Standards.

(iii) (S)he has specifically determined that the hotel, as constructed, provides:

(A) accessible car and van-accessible parking spaces required by the ADA Standards if parking facilities were provided;

(B) the number of accessible rooms for guests with mobility disabilities (including the number of accessible rooms with roll-in showers) and guests who are deaf or hard of hearing required under ADA Standards § 9.1;

(C) an inventory of accessible rooms required under ADA Standards § 9.1.2 ( i.e., rooms with features for individuals with mobility disabilities and hearing impairments) that includes at least one suite (if the hotel has more than one suite), one room with one bed, one room with two beds, and one room with a premium view (if the hotel offers more than one room with a premium view at a higher cost), one room on the executive level (if the hotel has an executive level), and one smoking room (if the hotel offers smoking rooms). At hotels where there are two or more premium views offered, the hotel shall not be required to provide an accessible room in a particular view category if fewer than 5% of the rooms at the hotel fall within that particular view category. For hotels that offer more than one

category of premium view rooms, the premium view accessible room shall be in the premium view category with the most rooms. Nothing in this subparagraph requires a hotel to have more accessible guest rooms than are required under ADA Standards §9.1.2.

(D) the required number of accessible rooms for individuals who are deaf or hard of hearing as set forth in ADA Standards §§ 9.1.2 and 9.1.3, that comply with ADA Standards § 9.3. Compliance with ADA Standards § 9.3 will be achieved by providing visual alarms connected to the building emergency alarm system, and visual notification devices for incoming telephone calls and door knock or bell, and complying with all other requirements of ADA Standards § 9.3.1 ( i.e., permanently installed telephones that have volume control and an accessible electrical outlet within 4 ft. of a telephone connection).

(E) the required number of accessible rooms for individuals with mobility disabilities that comply with the ADA Standards for maneuvering clearances between and around the beds (ADA Standards §9.2.2(1)), to and within the bathroom (ADA Standards § 9.2.2(6)), thermostat and controls (ADA Standards § 9.2.2(5)), and desks (ADA Standards §§ 9(1), 4.32), and accessible rooms for individuals with mobility disabilities with accessible bathrooms that comply with ADA Standards § 4.23.

19. Upon the Effective Date and continuing for the term of this Consent Decree, for all Alterations requiring HWI's consent at Managed Hotels and Joint Venture Hotels constructed for first occupancy after January 26, 1993, HWI shall (to the extent it has the contractual right to do so) (i) require the hotel owner to submit a certification from an architect stating that the architect has professional experience applying the requirements of the ADA and the ADA Standards and that the Alteration plans comply with the ADA; and (ii) upon completion of the Alterations, require the hotel owner to obtain a certification from that architect stating that the altered elements or spaces comply with the ADA. Alternatively, HWI (to the extent it has the contractual right to do so) may require the hotel owner to submit the Alteration plans to an ADA consultant approved by the United States for review and approval.

20. DESIGN AND CONSTRUCTION STANDARDS

(a) Within 60 days of the Consent Decree Date, HWI will submit all existing prototype building plans or designs currently in use to an ADA consultant approved by the United States for review regarding compliance with the ADA. The ADA consultant shall notify HWI in writing of any elements in the plans and designs that the ADA consultant deems non-compliant with the ADA Standards. HWI shall work in good faith with the ADA consultant to correct all such noncompliance in such plans and designs.

(b) For the term of the Consent Decree, to the extent that HWI creates new prototype building plans or designs for accessible rooms or other elements required to be accessible ( e.g., signage, front desk counter) for any Brand, it shall ensure that such designs comply with the ADA Standards. To the extent that the new prototype building plans or designs show elements or spaces required to be accessible under the ADA Standards, they shall specify the measurements required by the ADA Standards for these elements. All such new prototype plans or designs shall be submitted to an ADA consultant who has been approved by the United States for review prior to the new prototype plans or designs being used. Within 30 days of receipt of such plans and designs, the ADA consultant shall notify HWI in writing of any elements in the plans and designs that the ADA consultant deems non-compliant with the ADA Standards. HWI shall work in good faith with the ADA consultant to correct all such noncompliance in such plans and designs.

(c) HWI will continue to specify in the applicable design and construction standards for all Brand Hotels that such hotels shall comply with all federal, state, and local laws. In addition, HWI will, no later than one year after the Consent Decree Date, submit to the United States for review and approval a web-based design guide that identifies the ADA Standards requirements for: (1) registration and other service counters; (2) accessible guest room numbers and dispersion; (3) accessible public restrooms; (4) accessible tables in food and beverage areas; (5) accessible parking; (6) accessible routes to and throughout the hotel; (7) door widths and maneuvering clearances; (8) accessible elements within an accessible guest room, including toilets, tubs, showers, sinks, closets, thermostats and controls, draperies, doorways, and maneuvering spaces around beds; and (9) room dispersion as set forth in Paragraph 15(b). Within six months of receiving the United States' approval of the design guide content, HWI shall distribute the design guide to all Brand Hotels via web-based application. The web-based design guide shall state that the identified ADA Standards requirements are only some of the ADA Standards and shall refer users to the ADA Standards for a complete set of requirements.

21. BRAND STANDARDS, QUALITY ASSURANCE INSPECTIONS.

(a) For the term of this Consent Decree, HWI shall continue to specify that all Brand Hotels comply with the ADA in all of its Brand Standards and, within one year of the Consent Decree Date, will (i) specifically reference the ADA Standards in its Brand Standards, and (ii) state in its Brand Standards that Brand Hotels constructed for first occupancy after January 26, 1993 must have the required number of accessible rooms and the required number of accessible rooms with roll-in showers (ADA Standards § 9.1.2), the required number of removable tub seats (ADA Standards §§ 9(1), 9.1.2 and 4.20.3), the required number of accessible rooms for the hearing impaired (ADA Standards §§ 9.1.2, 9.1.3), and that roll-in showers must comply with ADA Standards § 4.21 and Figure 57(a) or (b).

(b) Within one year of the Consent Decree Date, HWI shall amend all of its Brand Standards to include the following standards for each Brand Hotel:

(i) The ADA Training Program for covered employees as set forth in Paragraph 24.

(ii) The provision of information regarding ADA Contact Person in in-room guest materials as set forth in Paragraph 28.

(iii) The designation of an onsite ADA Contact Person as set forth in Paragraph 28.

(iv) The complaint process described in Paragraph 31(c).

(v) One removable tub seat for each and every accessible tub room in the hotel that does not have a built-in seat.

(vi) The required number of permanent or portable visual alarms and notification devices for incoming telephone calls and door knock or bell to ensure that the hotel can fully equip the number of hearing impaired rooms set forth in ADA Standards § 9.1.3. Hotels in existence as of the Consent Decree Date may use portable visual alarms to meet this requirement. Hotels whose construction begins after the Consent Decree Date shall have permanent visual alarms.

(c) HWI will amend its Quality Assurance Inspection process to include the additions to the Brand Standards set forth in Paragraph 21(b) above. These additional requirements will be assigned point values and will be scored in the same manner as other Brand Standards requirements.

22. <u>POLICIES AND PROCEDURES</u>. For the term of this Consent Decree and effective within one year after the Consent Decree Date, Hilton shall review any existing policies pertaining to Title III of the ADA that are set forth in its Brand Standards Manuals to ensure that they are not inconsistent with Title III of the ADA, and will modify such policies if necessary. Nothing in this Paragraph 22 requires HWI to adopt any new policies relating to Title III of the ADA.

23. <u>ROOM UPGRADE POLICY AT ALL BRAND HOTELS</u>. For the term of this Consent Decree and effective within 90 days of the Consent Decree Date, unless otherwise prohibited by law, it shall be the policy at all Brand Hotels to offer to upgrade guests with disabilities to an accessible room in a more expensive class of room, if available, at no additional charge if the accessible room in the category of room that the guests initially reserved is unavailable at registration. Guests with disabilities may always upgrade to another available room at their own expense on the same basis as other guests.

24. <u>TRAINING FOR OWNED HOTELS, MANAGED HOTELS, AND JOINT VENTURE HOTELS</u>. The United States shall conduct an ADA Training Program for HWI that meets the requirements set forth in this Paragraph 24 within 90 days of the Consent Decree Date. No later than 9 months after the United States conducts the ADA Training Program and for the term of this Consent Decree, all employees working at Owned Hotels, Managed Hotels, and Joint Venture Hotels whose essential job functions require them to interact with hotel guests shall be required to complete a program to educate them on the use of service animals and effective communication with individuals with disabilities. Front desk employees, general managers, and chief building engineers, at Owned Hotels, Managed Hotels, and Joint Venture Hotels shall be required to complete an additional training program that includes the following additional topics: proper assignment of accessible rooms, emergency procedures for guests with disabilities, reasonable modifications of policies and procedures for guests with disabilities, maintenance of accessible features, the provision and use of roll-in showers with fold-down seats, the provision and use of removable tub seats, and operation of communications equipment for individuals with hearing impairments. The training specified in this Paragraph shall be referred to as the "ADA Training Program." Thereafter, newly-hired employees falling into the categories identified above at Owned Hotels, Managed Hotels, or Joint Venture Hotels shall be required to complete the ADA Training Program that applies to them within three months of hire. All employees required to undergo ADA Training will undergo refresher training every two years for the duration of this Consent Decree.

25. <u>RESERVATIONS SYSTEM</u>. No later than 18 months after the Consent Decree Date and for the term of this Consent Decree, HWI shall take steps to further

provide that (1) individuals with disabilities can make reservations for accessible rooms in the United States, including rooms for individuals with mobility disabilities and rooms equipped for individuals who are deaf or hard of hearing, over the Reservations System with the same opportunities to guarantee the reservation for an accessible room that are offered for any other reservation in the system; and (2) the options and amenities identified as available for particular rooms in the reservation process reflect accurately the inventory and availability of accessible guestrooms at all Brand Hotels. The Parties agree that HWI satisfies its obligations under this Paragraph 25 by implementing subsections (a) through (e) below:

(a) HWI will require that each Brand Hotel update the room inventory information that it supplies to the Reservations System to identify by room type which rooms are accessible, and for each such room type, which of the following accessibility or other features it has:

(i) Number of beds

(ii) Size of bed(s)

(iii) Roll-in shower or accessible tub

(iv) Visual alarms

(v) Executive level

(vi) Suite

(vii) Kitchen/kitchenette

(viii) View, if a particular hotel charges more for a room based on the view.

HWI will require that each hotel update the information collected in subparagraph 25(a) upon any material reconfiguration of room types and, in any event, no less than once every two years.

(b) HWI will configure the Reservations System such that users of the Reservations System will be able to determine, for any Brand Hotel, the current availability of accessible rooms by room type and which of the features set forth in subparagraph 25(a) above each such room type has.

(c) HWI will provide its Franchised Hotels with instructions and checklists to assist the hotels in accurately compiling the information described in subparagraph 25(a) above. HWI may rely in good faith on the information provided by the hotel owner of a Franchised Hotel described in subparagraph 25(a) above.

(d) The Parties recognize that the Reservations System currently accommodates only a limited number of room types due to capacity limits of the software, and that the inventory information prescribed by subparagraph 25(a) above may, for certain hotels, result in the hotel exceeding the room types number limitation. Accordingly, for any Brand Hotel for which the above-described process would cause the individual hotel to exceed 94 percent of its available computer capacity for room types, HWI may instead indicate (on the Reservations System) that the availability and reservation of some accessible rooms with some of the specific features described in subparagraph 25(a) above can be determined by calling the specific hotel, which HWI will facilitate by having a telephone Reservations System agent contact the Help Desk and/or call the hotel directly on behalf of the customer, obtain the requested information, and, if appropriate, make the reservation for the customer. For each Brand Hotel for which the room type limitations will be exceeded, HWI and the United States will reach agreement on those accessible features that will be categorized on the Reservations System. Under no circumstances will the limitations on capacity prevent a guest from using the Reservations System to complete a reservation for an accessible room, although some details about the features may not be displayed on the system at the time of the reservation. In addition, a guest who cannot make an online reservation because of the computer system's limitation on capacity for room types shall receive the price offered through HWI's online reservations system (on the date of booking) for the room that (s)he reserves, if that price is lower.

(e) HWI's policy shall be that in assigning guestrooms upon check-in, each Brand Hotel shall hold available at least two non-premium accessible rooms for guests requesting accessible rooms (if the hotel is required to have two or more accessible rooms and provided that there are two such rooms that have not been previously reserved by a guest requesting an accessible room) until those rooms are the last non-premium rooms available. If a hotel has accessible rooms with one bed and accessible rooms with two beds, the hotel will be required to hold available at least one accessible room in each category. Once the two non-premium accessible rooms are the only two rooms left in inventory, the hotel may sell the rooms to any guest. When a guest checks in for a reserved accessible room, hotel staff may ask if the guest needs the accessible features of that room for a disability. If the guest does not need the accessible features of that room for a disability, the hotel shall substitute a comparable available non-accessible room for that guest. Unless rooms designated

as accessible are the last of their room type(s) available at any given time (in which case, any guest may reserve the room(s)), rooms designated as accessible shall be rented only to persons specifically requesting such rooms for disability-related reasons, based on self-identification by the person(s) seeking to reserve the rooms. HWI shall facilitate self-identification by advising each guest who requests an accessible room by telephone that accessible rooms have features that are required by guests with disabilities and directing guests who do not need the room for a disability-related reason to select a non-accessible room if one is available. If a guest seeks to reserve a room on-line, HWI shall facilitate self-identification by advising guests by a pop-up notification that accessible rooms have features that are required by guests with physical disabilities and directing guests who do not need the room for a disability-related reason to select a non-accessible room if one is available.

       (f) If and when a customer reserves an available accessible room type at a property in the United States through the Reservations System, a room of that room type will be placed in reserve for that customer and will be taken out of the available inventory for that hotel. The room may be released back into available inventory if the reservation is cancelled or the customer fails to check in by the specified check-in deadline time. This Consent Decree does not require that a reserved accessible room or room type be made available if the room becomes unavailable for reasons beyond the reasonable control of the hotel, specifically including but not limited to the following: the occupant of the room has not checked out or vacated the room and the hotel has asked (by calling the guest room and leaving a voicemail message and putting a note on hotel letterhead under the guest room door if no one is there) whether the occupant would be willing to move to a non-accessible room, if one is available; the room is undergoing maintenance, or is otherwise not in a condition to be made available to a guest; or the hotel is closed, in whole or in part. For those occasions when the room is or has become unavailable for these or any other reasons, the hotel will attempt to identify and reserve an appropriate equivalent accessible accommodation for the guest at that hotel or another hotel.

       (g) To the extent necessary to implement this Paragraph 25, HWI will amend its Brand Standards.

    26. <u>WEBSITES</u>.

       (a) By no later than August 30, 2011 and for the term of this Consent Decree, the www.hilton.com website and the websites for the Brands that are constructed on the <u>www.hilton.com</u> domain shall comply with the Worldwide Web Consortium's Web Content Accessibility Guidelines (WCAG) version 2.0, Level A success criteria. The foregoing requirement shall not apply to any advertising provided by third parties that appears on the <u>www.hilton.com</u> domain, or links to

other domains that can be accessed from the www.hilton.com domain. If, during the term of this Consent Decree, the United States Department of Justice issues regulations setting standards for the accessibility of websites of public accommodations after the Effective Date, HWI will comply with such regulations and any effective dates therein.

(b) If, after August 30, 2011, the United States determines that HWI has not complied with subparagraph (a) above, it shall notify HWI of the specific instances of non-compliance. HWI will have 180 days from the receipt of such notification to address the alleged non-compliance. If the parties are unable to agree on HWI's compliance with subparagraph (a) above, the dispute resolution mechanism of Paragraph 35 shall apply.

27. <u>ADA COMPLIANCE OFFICER(S)</u>. No later than 180 days after the Consent Decree Date and for the term of this Consent Decree, HWI shall designate or hire one national ADA Compliance Officer who will be identified to all Brand Hotels. The ADA Compliance Officer shall serve as HWI's primary administrative contact on disability issues for all Brand Hotels for the public, and for the Parties to this Consent Decree. Any person appointed under this Paragraph 27 shall be a regular employee of HWI and shall complete the ADA Training Program once a year. The designated ADA Compliance Officer shall have authority to implement the requirements of this Consent Decree. HWI shall give the ADA Compliance Officer responsibility for HWI's compliance with Title III of the ADA and for implementing and administering HWI's obligations under this Consent Decree, including compliance with all reporting requirements herein.

28. <u>ADA ON-SITE CONTACT</u>. No later than 180 days after the Consent Decree Date and for the term of this Consent Decree, every Brand Hotel that is an Owned Hotel, Managed Hotel, or Joint Venture Hotel shall identify one on-site ADA Contact Person to the ADA Compliance Officer. These designated ADA Contact Persons shall have authority to resolve complaints at the local level. Any person appointed under this Paragraph 28 shall have a background in customer service. HWI shall place a notice in the in-room written hotel directory of services identifying the on-site ADA Contact Person as the person to contact for any questions or complaints regarding the services, amenities, accommodations, or facilities provided to persons with disabilities. The notice will identify the on-site ADA Contact Person and the telephone numbers and website address (www.ada.gov) for filing complaints of disability discrimination with the U.S. Department of Justice. This notice shall also be provided to guests checking into accessible rooms at the front desk. The information in this document shall be effectively communicated to guests with disabilities as needed. Each on-site ADA Contact Person shall be responsible for handling and documenting disability-related complaints at his or her hotel in the same manner in

which other guest complaints are handled. No later than one year after the Consent Decree Date, HWI shall amend its Brand Standards to require the implementation of a similar complaint process for every Brand Hotel that is a Franchised Hotel.

29. The ADA Compliance Officer and each on-site ADA Contact Person referenced in Paragraphs 27 and 28 above shall receive the required ADA training no later than 90 days after appointment, and annually thereafter.

30. No later than 120 days after the Consent Decree Date and for the term of this Consent Decree, HWI shall require that any employee of an Owned Hotel, Managed Hotel, or Joint Venture Hotel who receives a disability-related complaint (as described below) must refer the complaint to the ADA Contact Person for such hotel or, if the ADA Contact Person is unavailable, the manager on duty. If the complaint involves an alleged denial of service or accommodations to a person with disabilities, the ADA Contact Person or the manager on duty shall document the nature and outcome of the ADA-related complaint, specifying the name of the complainant(s), the name and location of the hotel, the date of the complaint, and the subject of the complaint, to ensure that any services or accommodations required by the ADA are provided within 24 hours of receipt of the complaint. If the complaint involves an allegedly non-compliant aspect of the design or construction of the hotel, within ten (10) business days of receiving the complaint the ADA Contact Person shall notify (i) the ADA Compliance Officer and ii) if the hotel is a Managed Hotel or Joint Venture Hotel, the owner of the hotel.

31. By one year after the Consent Decree Date and for the term of this Consent Decree, HWI shall specify that Franchised Hotels in the United States take the following actions, within 120 days after the requirement is imposed:

(a) Designate an onsite ADA Contact Person who shall have authority to resolve complaints at the local level as specified in Paragraph 30 above. Any person appointed as an ADA Contact Person shall have a background in customer service.

(b) Place a notice in the in-room written hotel directory of services advising guests to contact the ADA Contact Person with any questions or complaints regarding the services, amenities, accommodations or facilities provided to persons with disabilities. The notice will identify the on-site ADA Contact Person and the telephone numbers and website address (www.ada.gov) for filing complaints of disability discrimination with the U.S. Department of Justice. This notice shall also be provided to guests checking into accessible rooms at the front desk. The information in this document shall be effectively communicated to guests with disabilities as needed.

(c) Document (by the ADA Contact Person) the nature and outcome of all ADA-related complaints, specifying the name of the complainant(s), the name and location of the hotel, the date of the complaint, and the subject of the complaint. A summary of ADA complaints received and the outcome of each complaint shall be maintained at each hotel for one year.

(d) Implement an ADA Training Program as specified in Paragraph 24 above. All categories of employees of Franchised Hotels who must complete an ADA Training Program (as specified in Paragraph 24) hired after the expiration of the 120-day period referenced at the beginning of Paragraph 31 shall do so within 90 days of hire. HWI will make available its ADA Training Program to Franchised Hotels but such hotels may use their own ADA training program provided that it meets the requirements set forth in Paragraph 24. If a Franchised Hotel chooses to use its own ADA training program, the contents of that training program shall be provided to HWI's ADA Compliance Officer and made available to the United States upon written request.

32. <u>REPORTING AND CONFIDENTIALITY</u>.

(a) During the term of this Consent Decree, HWI will provide reports to the United States, six months, one year, 18 months, and three years after the Consent Decree Date, regarding HWI's progress with respect to the completion of its responsibilities pursuant to Paragraphs 15-31 of this Consent Decree. Each such report shall identify the modifications that HWI made under the terms of this Consent Decree and the United States shall have the right to request documents and evidence in sufficient detail for the United States to independently confirm that all modifications have been made in conformance with the ADA and the Parties' agreement. HWI will provide such documents and evidence within thirty days of a written request by the United States.

(b) The Parties agree that all information or communications generated in connection with this Consent Decree is voluntarily provided commercial information obtained from a person and is privileged and confidential as those terms are used in Title 5, United States Code, Section 552(b)(4). The Parties further agree that disclosure of the information would likely cause substantial competitive harm to HWI. The Parties and any ADA consultants, inspectors, or other persons retained specifically to effectuate the provisions of this Consent Decree are prohibited from disclosing to third parties (other than (1) the hotel owners whose respective hotels are the subject of the information or communications or (2) ADA consultants, inspectors, or other persons retained specifically to effectuate the provisions of this Consent Decree), and shall treat as privileged and confidential, all information or communications generated or obtained in connection with this Consent Decree. No

information or communications generated or obtained in connection with this Consent Decree shall be subject to discovery by any third party or used in any manner in any legal proceeding other than as necessary to implement the provisions of this Consent Decree or in an enforcement action brought by the United States.

33. Within ninety (90) days of the Consent Decree Date, HWI will pay a civil penalty in the amount of $50,000, as authorized by 42 U.S.C. § 12188(b)(2)(c), to vindicate the public interest.

34. <u>UNITED STATES' MONITORING RESPONSIBILITIES</u>.

(a) If the United States receives a complaint covered by Title III of the ADA against any Post-1993 Owned Hotel or Post-1993 Joint Venture Hotel, HWI shall cooperate with the United States to provide relevant information about the hotel for the United States' investigation. The United States shall describe the substance of the complaint to HWI. If the United States and HWI cannot agree on what information is relevant, the dispute resolution provisions of Paragraph 35 shall apply.

(b) If the United States receives a complaint covered by Title III of the ADA against any Post-1993 Managed Hotel, HWI shall, upon written request, provide the United States with the names and addresses of the owner(s) of the hotel, and information on whether that hotel has experienced, or will experience during the term of this Consent Decree, one of the events specified in Paragraph 16(a). If the United States chooses to make a request for the information described in the preceding sentence, the United States shall describe in writing the substance of the complaint to HWI. The United States may also seek by written request copies of any relevant records that the ADA Consultant is required to maintain pursuant to this Consent Decree about the hotel in question. If the United States makes such a written request of the ADA Consultant, it shall simultaneously notify HWI. Upon request by HWI, the ADA Consultant shall permit HWI to inspect the requested records within five days of HWI's request in order to verify that the records are relevant to the complaint received by the United States. The ADA Consultant shall not produce the requested records for a period of fifteen (15) days after the date on which (s)he receives the written request from the United States. If HWI does not notify the United States and the ADA Consultant in writing during this fifteen-day period that it considers some or all of the requested records not to be relevant to the complaint, the ADA Consultant shall immediately provide the requested records to the United States. If, during the fifteen-day period, HWI notifies the United States and the ADA Consultant in writing that it objects to production of some or all of the requested records to the United States and stating the reasons therefor, the Parties shall follow the dispute resolution procedures of Paragraph 35. HWI shall have the right to notify

the hotel owner of any requests for information or records made by the United States under this Paragraph 34(b).

(c) If the United States receives a complaint covered by Title III of the ADA against any Post-1993 Franchised Hotel, HWI shall, upon written request delivered to HWI by overnight delivery service, provide the United States with the names and addresses of the owner(s) of the hotel, and information on whether that hotel has experienced, or will experience during the term of this Consent Decree, one of the events specified in Paragraph 16(a). The United States may also seek by written request copies of any relevant records the ADA Consultant is required to maintain pursuant to this Consent Decree about the hotel in question. If the United States makes such a written request of the ADA Consultant, it shall simultaneously notify HWI by means of overnight delivery service. HWI shall notify the owner of the hotel in question about the request within five (5) business days of receiving the notification from the United States. The ADA Consultant shall not produce the requested records prior to the expiration of twenty (20) days from receipt of the written request from the United States.

## DISPUTES AND ENFORCEMENT

35. The United States may review compliance with this Consent Decree at any time and may enforce this Consent Decree if the United States believes that this Consent Decree or any requirement thereof has been violated. If the United States believes that this Consent Decree or any portion of it has been violated, the United States will raise concerns with HWI, and the Parties will attempt to resolve the concerns in good faith. The United States will give HWI forty-five (45) days to cure any non-architectural violation and ninety (90) days to cure an architectural violation prior to instituting any court action, starting from the date the United States notifies HWI of any violation of this Consent Decree. Except as provided in the foregoing sentence, either Party shall also have the right to bring any disputes concerning the Parties' respective obligations under this Consent Decree to the Court after giving the other Party 45 days' notice of its intent to seek the Court's assistance in resolving the matter.

36. Failure by the United States to enforce any provision of this Consent Decree shall not be construed as a waiver of the United States' right to enforce other provisions of this Consent Decree.

37. This Consent Decree does not affect HWI's continuing responsibility to comply with all aspects of the ADA. For a period of 11 years from the Effective Date of this Consent Decree, the United States releases HWI from any and all ADA-related

claims of which the United States had notice as of the Consent Decree Date, including any and all claims or allegations set forth or referred to in the Complaint and or Paragraphs 1 through 12 of this Consent Decree.

38. This Consent Decree shall remain in effect starting on the Consent Decree Date and ending four (4) years from the Effective Date. The Court shall retain jurisdiction to enforce this Consent Decree. This Consent Decree will expire four (4) years from the Effective Date, except as set forth in Paragraph 16(j).

39. This Consent Decree constitutes the entire agreement among the Parties relating to Department of Justice Number 202-16-168. No other statement, promise, or agreement, either written or oral, made by any Party or agents of any Party, that is not contained in this written Consent Decree shall be enforceable.

40. This Consent Decree shall be binding on HWI. In the event HWI seeks to transfer or assign all or part of its ownership interest in any Owned Hotels to an unrelated party, and the successor or assignee intends on carrying on the same or similar use of the facility, HWI shall provide written notice, including the name and address of the purchaser and any legal agent, to the United States within 10 days of such sale. This Consent Decree shall not apply to any hotels that become Brand Hotels as a result of a merger taking place after the Consent Decree Date, or to any hotels belonging to an unrelated entity that acquires HWI or any of its Brand Hotels after the Consent Decree Date. HWI shall provide to the United States written notice of any such merger or acquisition within 10 days after the event takes place.

41. The individuals signing this Consent Decree represent that they are authorized to bind the Parties to this Consent Decree.

DATED this 29th day of November 2010.

BY THE COURT:

/s/ Richard Roberts
United States District Judge

AGREED AND CONSENTED TO:

For the United States:

Thomas E. Perez

-56-

Assistant Attorney General
Civil Rights Division
Samuel R. Bagenstos
Principal Deputy Assistant Attorney General


_____     Ronald A. Machen
J ohn L. Wodatch, Chief, Disability Rights       United States Attorney
Section                                          Office of the United States Attorney
Philip L. Breen, Special Legal Counsel           District of Columbia
Renee M. Wohlenhaus, Deputy Chief                555 4th Street, NW
Phyllis M. Cohen, Senior Trial Attorney          Washington, D.C. 20530
Beth A. Esposito, Trial Attorney                 (202) 514-7566
Joy Levin Welan, Trial Attorney
U.S. Department of Justice 950 Pennsylvania
Avenue, NW B NYA
Washington, D.C. 20530
(202) 307-0663


For Defendant Hilton Worldwide Inc.:


_____
Richard M. Lucas
Executive Vice President and General Counsel
Laura Stover Danysh,
Senior Counsel Dispute Resolution
Hilton Worldwide Inc.
7930 Jones Branch Drive
McLean, VA 22102

_____     _____
J ames W. Cooper, Esq.                           Minh N. Vu, Esq.
Kenneth Chernof, Esq.                            Seyfarth Shaw LLP
Arnold & Porter LLP                              975 F Street, N.W.
555 Twelfth Street, N.W.                         Washington, D.C. 20004
Washington, D.C. 20004                           (202) 828-5337
(202) 942-5000

November 9, 2010